FILED
2016 Sep-30  AM 08:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **RICHARD EARL DAYE, JR.** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  1:14-CV-01898-MHH** |
| } | |
| **CAROLYN W. COLVIN,** } | |
| **Commissioner of the** } | |
| **Social Security Administration,** } | |
| } | |
| **Defendant.** } | |
| } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Richard Earl Daye, Jr. seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Daye's claims for a period of disability and disability insurance benefits and supplemental security income.  After careful review, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Mr. Daye applied for a period of disability and disability insurance benefits on March 14, 2013.  (Doc. 7-6, p. 11).  Mr. Daye applied for supplemental security income on April 2, 2013.  (Doc. 7-6, p. 5).[1]  Mr. Daye alleges that his disability began on April 4, 2011.  (Doc. 7-6, pp. 5, 11).  The Commissioner initially denied

---

[1] Mr. Daye acknowledges that he applied for disability benefits previously.  (Doc. 7-6, p. 11).

Mr. Daye's claims on May 23, 2013. (Doc. 7-5, pp. 4, 9). Mr. Daye requested a hearing before an Administrative Law Judge (ALJ). (Doc. 7-5, p. 23). The ALJ issued an unfavorable decision on April 17, 2014. (Doc. 7-3, p. 28). On August 14, 2014, the Appeals Council declined Mr. Daye's request for review (Doc. 7-3, p. 3), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II.   STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the

ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r of Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past

3

relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.  For purposes of evaluating Mr. Daye's request for a period of disability and disability insurance benefits, the ALJ noted that Mr. Daye had sufficient coverage to remain insured through June 30, 2013, so he had to establish disability on or before June 30, 2013 to be entitled to a period of disability and disability insurance benefits.  (Doc. 7-3, p. 31).

For purposes of Mr. Daye's request for supplemental security income, Mr. Daye is "eligible in the first month where [he] is both disabled and has an SSI application on file."  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing 20 C.F.R. § 416.202-03); *see also Moncrief v. Astrue*, 300 Fed. Appx. 879, 880 n.1 (11th Cir. 2008) ("Unlike SSI, which has no insured status requirement, a claimant must demonstrate disability on or before the last date on which [he] was insured in order to be eligible for DIB").

In this case, the ALJ found that Mr. Daye has not engaged in substantial gainful activity since April 4, 2011, the alleged onset date.  (Doc. 7-3, p. 33).[2]  The

---

[2] The ALJ explained that Mr. Daye worked after his alleged onset date, but the work "did not rise to the level of substantial gainful activity."  (Doc. 7-3, p. 33).  The ALJ stated:

ALJ determined that Mr. Daye suffers from the following severe impairments: bipolar disorder, ADHD (attention deficit hyperactivity disorder), depression, and anxiety. (Doc. 7-3, p. 34). Based on a review of the medical evidence, the ALJ concluded that Mr. Daye does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 34).

Next, the ALJ evaluated Mr. Daye's residual functional capacity in light of his impairments. The ALJ determined that Mr. Daye has the residual functional capacity "to perform a full range of work at all exertional levels" with the following non-exertional limitations:

> The claimant is able to work with a sit/stand option at will. He should avoid any concentrated exposure to noise and pulmonary irritants such as fumes, odors, dust, and gas. He should avoid any exposure to unprotected heights, dangerous machinery, uneven surfaces, large bodies of water and commercial driving. His condition would result

---

The earnings record reflects [Mr. Daye] earned $1994.29 in 2012 (Ex. 15D), the year after []he alleged []he was no longer able to perform work activity at a sustainable pace. The Social Security Administration has established limits on the amount of earnings an individual can earn each month before those amounts are deemed substantial. For 2012, the maximum amount allowable was $1010 a month or $12,120 for the entire year. As it is unclear if these earnings were obtained during a single month or over a longer period, the undersigned gives the benefit of the doubt to [Mr. Daye] and finds that these earnings do not constitute substantial gainful activity. However, it does erode [Mr. Daye's] allegations that he was no longer able to earn a living after April 4, 2011.

(Doc. 7-3, p. 33).

in one to two unplanned absences a month.  He could perform unskilled work with simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes.  He could perform low stress work with only simple work-related decisions with few work place changes.  He could perform work without fixed production rate[s] and only occasionally [sic] interaction with the public, supervisors, and co-workers.  He could work where he is not in close proximity to others to avoid being easily distracted.

(Doc. 7-3, p. 37).

Based on this RFC, the ALJ concluded that Mr. Daye is not able to perform his past relevant work as a short order cook, a hand packager, a stocker, or a driver. (Doc. 7-3, pp. 46-47).  Relying on testimony from a vocational expert, the ALJ found that other jobs exist in the national economy and in Alabama that Mr. Daye can perform.  Those jobs include marker, food preparer, and inspector.  (Doc. 7-3, p. 47).  Accordingly, the ALJ determined that Mr. Daye is not disabled within the meaning of the Social Security Act.  (Doc. 7-3, p. 48).

## IV.   SUMMARY OF THE MEDICAL EVIDENCE

### A.   Medical Record Before the ALJ

The administrative record contains a collection of outpatient treatment notes from at least two treating sources, records from an emergency room visit, and records from an overnight hospital stay.  The administrative record also contains

6

reports from three consultative examinations and a report from a state-agency reviewing physician.

On March 3, 2011, Mr. Daye saw his primary care physician, Dr. James Yates. Mr. Daye reported that he could not stay focused and would "jump from one thing to another." (Doc. 7-8, p. 6). Mr. Daye explained that he would alternate between feeling either very hyper or very lethargic. Mr. Daye reported that he had conversations with himself. Mr. Daye stated that he had "no suicidal thoughts." (Doc. 7-8, p. 6). Dr. Yates diagnosed Mr. Daye with attention-deficit disorder and some bipolar events. (Doc. 7-8, p. 6). Dr. Yates prescribed Seroquel and Adderall. (Doc. 7-8, p. 6).

When Mr. Daye saw Dr. Yates on April 21, 2011, Mr. Daye reported that he felt "much better with the current medications." Mr. Daye was not experiencing "the racing thoughts," and he was "[s]leeping well and staying focused." (Doc. 7-8, p. 6). Mr. Daye reported no side effects from the medication, and Dr. Yates noted that Mr. Daye's attention-deficit disorder and bipolar disorder were stable. Dr. Yates refilled Mr. Daye's Seroquel and Adderall prescriptions and instructed him to follow up in one month. (Doc. 7-8, p. 6).

On May 23, 2011, Dr. Yates noted that Mr. Daye "[o]verall [was] doing pretty well." (Doc. 7-8, p. 6). Mr. Daye had "a little more trouble staying on task." (Doc. 7-8, p. 6). Dr. Yates noted that Mr. Daye's attention-deficit disorder was "still slightly symptomatic," but his bipolar disorder remained stable. (Doc. 7-8, p. 6). Dr. Yates increased Mr. Daye's Adderall dosage and refilled Mr. Daye's Seroquel prescription.

On August 18, 2011, Mr. Daye told Dr. Yates that the Seroquel was making him drowsy. Dr. Yates noted the side effect and discontinued the Seroquel prescription. Dr. Yates prescribed Lithium instead and refilled Mr. Daye's Adderall prescription. (Doc. 7-8, p. 5). On October 24, 2011, Dr. Yates refilled Mr. Daye's Adderall prescription and indicated that Mr. Daye would need an appointment to receive additional prescriptions. (Doc. 7-8, p. 5).

On December 14, 2011, consultative psychologist Dr. Dana K. Davis performed the first of two agency-ordered mental examinations. (Doc. 7-8, p. 9; *see also* Doc. 7-3, p. 40).[3] Dr. Davis reviewed Mr. Daye's symptoms and Dr. Yates's outpatient treatment notes from February 2011 to October 2011. Based on

---

[3] It is not clear from the administrative record, but it appears that Dr. Davis's December 2011 evaluation likely took place in conjunction with Mr. Daye's previous application for disability benefits.

her mental status examination, Dr. Davis found that Mr. Daye's thought process was logical, his abstract thinking was normal, he had no hallucinations, and his intelligence was "low average." (Doc. 7-8, p. 10-11). Dr. Davis noted Mr. Daye's prior diagnoses of bipolar disorder and ADHD, but she was skeptical of these diagnoses after her examination. (Doc. 7-8, p. 11). Dr. Davis explained that Mr. Daye may have a mild mood disorder. (Doc. 7-8, p. 11). She noted that he was working at the time and "doing fairly well." (Doc. 7-8, p. 11).

One week after Dr. Davis's examination, Mr. Daye saw Dr. Yates and explained that he was out of medication and was "having some episodes of lack of focus and having trouble with his dyspnea." (Doc. 7-8, p. 16). Dr. Yates diagnosed Mr. Daye with withdrawal affect, bipolar disorder, and attention-deficit disorder. (Doc. 7-8, p. 16). Dr. Yates restarted Mr. Daye on Lithium and refilled his Adderall prescription. (Doc. 7-8, p. 16).

Mr. Daye saw Dr. Yates again on February 29, 2012. Mr. Daye had not taken Lithium for five or six days because he thought he needed a new prescription each month. (Doc. 7-8, p. 15). Dr. Yates explained that Mr. Daye could get Lithium refills without a new prescription because Lithium is not a controlled

substance.    (Doc. 7-8, p. 15).    Dr. Yates also refilled Mr. Daye's Adderall prescription during the February 29, 2012 visit.

Dr. Yates refilled Mr. Daye's Adderall prescription at least once between the February 29, 2012 visit and Mr. Daye's next documented clinic visit on September 24, 2012.  (Doc. 7-8, p. 15).   On September 24, 2012, Dr. Yates discovered that Mr. Daye had a misunderstanding about his medication.  Mr. Daye had been taking Lithium by itself for a week or two and then taking Adderall by itself for a week or two.   Dr. Yates explained to Mr. Daye that he could take both Lithium and Adderall at the same time.  Dr. Yates noted Mr. Daye's attention-deficit disorder and bipolar disorder diagnoses.  (Doc. 7-8, p. 15).  Dr. Yates refilled Mr. Daye's Adderall prescription and restarted Mr. Daye on Lithium.  (Doc. 7-8, p. 15).

Treatment notes from February 19, 2013 reflect that Mr. Daye still was not taking his medication correctly.  Mr. Daye would wake up with cold sweats in the middle of the night.  Mr. Daye felt paranoid, and he was hearing noises.  (Doc. 7-8, p. 14).  Dr. Yates made no reference to Mr. Daye's attention-deficit disorder during this visit, and Dr. Yates discontinued Mr. Daye's Adderall prescription.  Dr. Yates restarted Lithium and stressed to Mr. Daye the importance of taking the medicine regularly.  (Doc. 7-8, p. 14).

10

Dr. Davis performed a second agency-ordered mental examination on May 15, 2013. (Doc. 7-8, p. 18). Dr. Davis reviewed her December 2011 findings, Mr. Daye's reported symptoms, and Dr. Yates's treatment notes from 2011 through 2013. Dr. Davis noted that Mr. Daye had been "treated in the outpatient setting on and off for a couple of years." (Doc. 7-8, p. 18).

Dr. Davis reviewed Mr. Daye's family, education, and work history. Mr. Daye continued to live with his parents. (Doc. 7-8, p. 18). Mr. Daye told Dr. Davis that he "has a few friends and socializes at times," but Mr. Daye complained that he was "more socially isolative [in] the last year or so." (Doc. 7-8, p. 18). Dr. Davis stated that Mr. Daye attended public schools through the seventh grade. Mr. Daye was home-schooled for eighth and ninth grades but stopped his school work because he had trouble paying attention. (Doc. 7-8, p. 18). Dr. Davis noted that Mr. Daye attempted the GED and passed every section but math. (Doc. 7-8, p. 18).

Mr. Daye told Dr. Davis that he quit his most recent job unloading trucks at Walmart "because he had trouble being around all the other people." (Doc. 7-8, p. 19). Mr. Daye reported that he had both ADHD and bipolar disorder. Mr. Daye explained that his medication helped him concentrate and organize his thoughts more clearly. (Doc. 7-8, p. 19). Dr. Davis noted that Mr. Daye had neither sought

11

nor received "any specific mental health treatment by a psychiatrist, psychologist,

counselor, or other provider." (Doc. 7-8, p. 19). Mr. Daye reported that:

> he often feels paranoid around others, he does not like being pressed by others, he finds it hard to concentrate, and [] he sees his 7-year-old daughter, who actually passed away when she was 4 years of age about three years ago. He reports that sometimes he sees her face at night, she talks to him, and he talks back to her. He reports that he does have some mood swings ranging from angry and irritable moods, through feeling somewhat emotionless. Sometimes it is difficult for him to sit still and listen to others, and he finds himself getting very restless. He describes his emotional difficulties as feeling as if his emotions are "floating like water." He also tells me has trouble relaxing, and he has trouble sleeping, noting that sometimes he goes for weeks without sleeping. His appetite is described as variable.

(Doc. 7-8, p. 19).

> Regarding activities of daily living, Dr. Davis stated:

> Mr. Daye is independent in all ADLs. He has a driver's license and drives without assistance, and drove himself to the interview today. He really could not describe hobbies or other interests, reporting that he basically stays shut up in his room all day and he just does not do anything but read. He states that he has "associates" but not any real good friends. He could not describe any activities that he engages in with these associates. He reports that his mother does all the cooking, but he does clean his room. He reports further that his mother often has to "make [him]" get up and help with things. His sleep has been previously described as difficult, and again appetite is described as variable, though he does appear to be a well-developed and well-nourished male.

(Doc. 7-8, p. 20).

Based on her examination, Dr. Davis found that Mr. Daye had "some vague visual hallucinations" and "some paranoid ideation" with the sense that people were out to get him, but her other findings about Mr. Daye's thought process, abstract thinking and intelligence were consistent with her findings from 2011. (Doc. 7-8, p. 20; *see* p. 9, *supra*).   Dr. Davis summarized her findings and prognosis as follows:

> Richard Daye is an interesting 23-year-old male client who was evaluated on this date at the request of DDS.   The client has had no treatment in the mental health setting previously, but has been seeing his general practice physician in outpatient care for what he describes as bipolar disorder and AD/HD.   His report of symptoms is quite frankly rather questionable overall, and do [sic] not, in fact, fit criteria for a full-blown diagnosis of bipolar disorder, though he may have some issues with attention problems.   The only thing I can really diagnose at this point is a mood disorder, [not otherwise specified], without any real confirming psychiatrist evidence otherwise.

(Doc. 7-8, p. 21).

On August 23, 2013, Mr. Daye's father and girlfriend took him to the emergency room at Jacksonville Regional Medical Center for a possible amphetamine overdose. (Doc. 7-8, pp. 26-27).   Mr. Daye's father found him disoriented in a closest earlier that day.   (Doc. 7-8, p. 26).   Mr. Daye told the attending physician that he "hears voices [and] he has for many years" that instruct

13

him to hurt himself and others.  (Doc. 7-8, p. 26).  Mr. Daye reported symptoms of depression and suicidal thoughts.  (Doc. 7-8, p. 24).

On August 30, 2013, Mr. Daye sought treatment at the Calhoun-Cleburne Mental Health Board.   Mr. Daye met with a certified nurse pracititioner and a therapist.   (Doc. 7-9, pp. 3-15).   Mr. Daye told the certified registered nurse practitioner that his mother "suggested that [he] come get help for his problems" including "depression, anxiety, and paranoia."  (Doc. 7-9, p. 5).

Mr. Daye reported to the nurse practitioner that his psychiatric problems began five years earlier, when he was 18 years old.  (Doc. 7-9, p. 3).  He stated that he had been fired two times, once for fighting and once for being late.  (Doc. 7-9, p. 4).  The nurse practitioner noted that Mr. Daye has a "[l]ong history of anxiety." (Doc. 7-9, p. 6).  The nurse practitioner reported that Mr. Daye cut himself the year before, but he had not tried to commit suicide.  (Doc. 7-9, p. 6).   The nurse practitioner made the following findings during a mental status examination:

> 23 [year old black male] appropriately dressed.  States his mood is depressed [and] affect flat.  No eye contact via telemed.  Is guarded. Speech is so low in volume practitioner had to have therapist[']s help in interpreting.  Thought process is circumstantial.  Thought content as above with recent history of auditory and visual hallucinations along with paranoia.  Currently he denies [audio/visual hallucinations] but uncertain if he is forthcoming.  [C]urrently denies [suicidal or homicidal ideations].  Pyschomotor retardation present.  Memory

14

unable to get full assessment at this time.   Concentration seems
somewhat impaired at this time.   Insight into his illness very poor.
Judgement [sic] impaired.

(Doc. 7-9, p. 6).

The nurse practitioner diagnosed Mr. Daye with "[p]sychosis NOS DXX
Schizophrenia, Paranoid Type" and "Personality d/O NOS."  (Doc. 7-9, p. 6).  The
nurse practitioner recommended "acute care in patient treatment."  (Doc. 7-9, p. 6).
Treatment notes explain that Mr. Daye refused admission to an inpatient facility
because "he is afraid of hospitals [] and other excuses."  (Doc. 7-9, p. 6).  A
therapist contacted Mr. Daye's father and emphasized safety precautions.  Mr.
Daye agreed "to go to ED for admission maybe on Monday."  (Doc. 7-9, p. 6).

The therapist who met with Mr. Daye developed a treatment plan.  The
therapist identified the following clinical needs or significant issues:  safety/crisis,
psychiatric, emotional/psychological, thinking, behavior, financial, family/social
support, vocational, leisure, and communication.  (Doc. 7-9, p. 13).  The therapist
stated that Mr. Daye's "suicidal ideations" and "history of aggression" were
barriers to treatment.  (Doc. 7-9, pp. 13-14).  The therapist explained that Mr.
Daye's objectives were to "immediately report decompensation to staff, contact
911, utilize ER, or seek assistance through emergency on-call services."  (Doc. 7-9,

pp. 13-14).  Mr. Daye's treatment plan included group therapy, family support and education, physician medical assessments, medication monitoring, crisis intervention/resolution, and mental health consultation.  (Doc. 7-9, p. 15).

In September 2013, Northeast Alabama Regional Medical Center admitted Mr. Daye under the care of Dr. Christopher Randolph for inpatient treatment of mood instability and "suicidal ideation."  (Doc. 7-8, p. 38).  Dr. Randolph stated that Mr. Daye "had a history of treatment at the mental health center with Lexapro, Wellbutrin, and Adderall."  (Doc. 7-8, p. 38; *see also* Doc. 7-8, p. 44 noting Mr. Daye's "[p]revious psychiatric treatment").  Dr. Randolph also reviewed the treatment that Mr. Daye received from Dr. Yates.  (Doc. 7-8, p. 38).

Upon admission, Mr. Daye complained that "he ha[d] been hyperactive, had intrusive thoughts and distractibility recently."  (Doc. 7-8, p. 38). Mr. Daye appeared well groomed, well enunciated, and had "no current hallucinations," but his insight was "poor" and his process was "distracted."  (Doc. 7-8, p. 38).  Dr. Randolph concluded that Mr. Daye was suffering from bipolar disorder, though he found Mr. Daye's previous ADHD diagnosis questionable.  (Doc. 7-8, p. 38).  Dr. Randolph recommended that during Mr. Daye's hospitalization, he discontinue his previous medications and begin a "[t]rial with Lamictal."  (Doc. 7-8, p. 38).

Mr. Daye spent four days in the hospital.  (Doc. 7-8, p. 44).  Mr. Daye was "started on every 15 minutes safety observations," and as Dr. Randolph recommended, Mr. Daye discontinued his Adderall, Lexapro, and Wellbutrin. (Doc. 7-8, p. 43).  Doctors started Mr. Daye on Trilafon and Lamictal.  Doctors "chose [a] mood stabilizer in lieu of [an] antidepressant as it appear[ed] that antidepressants have not been effective in treating his mood disorder and have, in fact, made him worse as did the stimulants."  (Doc. 7-8, p. 43).  Discharge notes state:

> Mr. Daye was monitored on the unit, encouraged to attend and participate in scheduled milieu activity, and by date of discharge, it was judged that he had reached optimal benefit from hospitalization. He was discharged to follow up with the mental health center. Appointment date and time were given.

(Doc. 7-8, p. 43).

On November 14, 2013, Mr. Daye attended an individual therapy session at Calhoun-Cleburne Mental Health Board.  (Doc. 7-9, p. 8).  Mr. Daye told the therapist that he had not slept in three or four days.  (Doc. 7-9, p. 8).  The therapist noted that Mr. Daye's cognition and speech were "appropriate."  Mr. Daye had probable deficits in his judgment, insight, and abstracting ability.  (Doc. 7-9, p. 8). Mr. Daye told the therapist that he had not been hospitalized since September

17

2013, but he was "agitated and angry for no reason" and felt that "the Lamictal [was] causing him to be more depressed and not effective."  (Doc. 7-9, p. 8).  Mr. Daye reported that he avoided interaction with his family. Mr. Daye agreed to participate in a more intensive program like a residential day program; however, due to limited availability, the therapist noted that providers would see Mr. Daye on an outpatient basis until he could be placed in a residential day program.  (Doc. 7-9, pp. 8-9).

On December 5, 2013, Mr. Daye saw another therapist at Calhoun-Cleburne Mental Health Board.  (Doc. 7-10, p. 47).  The therapist stated that the medication regimen that was prescribed for Mr. Daye was not effective.  (Doc. 7-10, p. 47).  Mr. Daye reported that he had trouble sleeping, and when he would sleep, he would "awaken drenched in sweat."  (Doc. 7-10, p. 47).  Mr. Daye stated the stopped taking the Lamictal that Dr. Randolph prescribed because he believed "it was making him more depressed and might have been causing night sweats." (Doc. 7-10, p. 47).  Mr. Daye was no longer having suicidal or homicidal thoughts, but he "still [found] himself in the closet sometimes and [could not] say why." (Doc. 7-10, pp. 47-48).   The therapist changed Mr. Daye's Perphenazine

prescription to Risperdal, and she changed his Lamictal prescription to Depakote. (Doc. 7-10, p. 48).

On December 16, 2013, Dr. Robert Storjohann examined Mr. Daye at the request of his attorney. (Doc. 7-9, p. 18). Mr. Daye reported that he had heard demonic voices since he was 9 or 10 years old; the voices were telling him to hurt or kill people; he had seen demons since he was 15 or 16 years old; he had assaultive ideations, once dousing a sexual partner in gasoline and attempting to set her on fire; and he professed a belief in UFOs and paranormal activity. (Doc. 7-9, pp. 19, 20). Dr. Storjohann noted that Mr. Daye's recent memory was "intact" and his remote memory was "grossly intact." (Doc. 7-9, p. 21). Though Mr. Daye's thoughts were "logical, coherent, and goal-oriented," his thought content was "quite delusional" during the exam and his judgment and insight were "extremely poor." (Doc. 7-9, p. 22). Dr. Storjohann concluded that Mr. Daye's prognosis "during the coming 6 to 12 months is considered extremely poor," and that he "is in need of intensive mental health treatment, perhaps to include day treatment or partial hospitalization services." (Doc. 7-9, p. 24).

Mr. Daye saw Dr. Yates again on February 17, 2014. (Doc. 7-10, p. 50). Mr. Daye reported that he was "not feeling well." Mr. Daye told Dr. Yates that he

was having side effects from his medication, so Mr. Daye "basically discontinued" his Risperdal and Depakote.  (Doc. 7-10, p. 50).  Since Mr. Daye stopped his medication, he ha[d] been having some behavior issues" and some "thought issues."  (Doc. 7-10, p. 50).  Dr. Yates stated that Mr. Daye "[h]ad a violent act a couple of weeks ago that got him in jail for overnight."  (Doc. 7-10, p. 50).  Dr. Yates refilled Mr. Daye's Adderall prescription and gave him a prescription for Ativan and Zyprexa.  Dr. Yates also discussed "getting back in with mental health."  (Doc. 7-10, p. 50).

On March 11, 2014, Mr. Daye saw a therapist at Calhoun-Cleburne Mental Health Board.  (Doc. 7-10, p. 62).  The therapist explained that Mr. Daye's clinical needs and significant issues included psychiatric, financial, emotional/psychological, family/social support, thinking, behavior, and communication.  (Doc. 7-10, p. 62).  Mr. Daye's long-term recovery view was to "be mentally and physically stable and continue to stay in Alabama."  (Doc. 7-10, p. 62).  Treatment notes state that one of Mr. Daye's goals was to "learn to manage his mental health by reporting 50% reduction of paranoia, taking medication as prescribed and using coping tools daily."  (Doc. 7-10, p. 62).  Mr. Daye's treatment plan also included instructions for Mr. Daye to attend "all therapeutic sessions in

order to gain additional insight into how to manage his mental health." (Doc. 7-10, p. 63). A psychiatrist would evaluate Mr. Daye for a "continuation of medication regimen" and would educate Mr. Daye "on the importance of med[ication] compliance." (Doc. 7-10, p. 63).

Another treatment goal was for Mr. Daye to "increase his independence as evidenced by completing the Math segment/portion of the GED by [] Jan[uary] 2015[] and seeking employment via ADRS or [a] staffing agency." (Doc. 7-10, p. 63). A specific objective listed under this goal stated that Mr. Daye would "apply for job positions and opportunities." (Doc. 7-10, p. 64).

On March 18, 2014, a psychiatrist approved the therapist's recommended treatment plan for Mr. Daye. (Doc. 7-10, p. 66).

On April 16, 2014, Mr. Daye participated in individual therapy at Calhoun-Cleburne Mental Health Board. (Doc. 7-10, p. 58). Mr. Daye reported that "he [wa]s continuing to experience bouts of paranoia and note[d] his girlfriend found him outside the home in the woods." (Doc. 7-10, p. 58). Mr. Daye stated that he "had drifted in the night and at times hears things calling him out there such as a force pulling him." (Doc. 7-10, p. 58). The therapist noted that this behavior sounded like a symptoms of Mr. Daye's paranoia and delusion. The therapist

planned to schedule an appointment for Mr. Daye to see a psychiatrist, and she encouraged Mr. Daye to "be consistent with [his] current med[ications]." (Doc. 7-10, p. 58). The therapist did not recommend a change in Mr. Daye's medication regimen. Mr. Daye stated that he was continuing to work toward getting his GED; he hoped to pass the math portion of the test in June 2014. The therapist encouraged Mr. Daye to practice, take his time, and be well prepared. (Doc. 7-10, p. 58). The therapist recommended that Mr. Daye continue his current treatment plan. (Doc. 7-10, p. 58).

### B.   Medical Evidence That Mr. Daye Submitted to the Appeals Council

Mr. Daye submitted additional medical evidence to the Appeals Council, including treatment notes from visits to the Calhoun-Cleburne Mental Health Board and records from at least one visit with Dr. Yates.

An April 24, 2014 physician progress note from Calhoun-Cleburne Mental Health Board states that the medication regimen then prescribed for Mr. Daye was not effective because Mr. Daye complained of decreased focus. (Doc. 7-3, p. 20). Mr. Daye reported that he was concerned that his Risperdal would cause gynecomastia. Mr. Daye also stated that he was "alw[a]ys paranoid" and he was

"heari[n]g demonic voices" and "seeing [his] deceased daughter."  (Doc. 7-3, p. 20).  The psychiatrist started Mr. Daye on a trial of Geodon.  (Doc. 7-3, p. 21).

According to a general progress note dated May 28, 2014 from the Calhoun-Cleburne Mental Health Board, Mr. Daye reported that he "continue[d] to lack motivation and seem[ed] constantly sleepy."  (Doc. 7-3, p. 24).  Mr. Daye told the therapist that his Geodon was making him drowsy.  The therapist sought guidance from a psychiatrist who recommended that Mr. Daye should reduce the amount of Geodon he was taking.  The therapist "explained to [Mr. Daye] that he must work along with the med[ications] because his body must get use[d] to them."  (Doc. 7-3, p. 24).  Mr. Daye reported that he was "still working to get his GED."  The therapist also encouraged "consistency with the [GED review] class."  (Doc. 7-3, p. 24).

On June 2, 2014, Mr. Daye saw a psychiatrist at the Calhoun-Cleburne Mental Health Board.  (Doc. 7-3, p. 15).  Mr. Daye reported having a depressed mood, decreased energy, low interests, and hallucinations over the previous month.  (Doc. 7-3, p. 15).  Mr. Daye was cooperative during the examination; his speech rate and volume was normal; he had congruent affect and logical thought process.  Mr. Daye was alert; he had intact attention and concentration; his fund of

knowledge was average; his language was intact.  Mr. Daye's insight and judgment were fair.  (Doc. 7-3, pp. 15-16).  The psychiatrist diagnosed psychotic disorder, paranoid type schizophrenia, and personality disorder.  (Doc. 7-3, p. 16).  The psychiatrist discontinued Mr. Daye's Geodon because of side effects and prescribed Abilify in its place.  (Doc. 7-3, p. 17).  The psychiatrist recommended that Mr. Daye continue his current treatment plan and return for a follow up visit in four weeks.  (Doc. 7-3, p. 17).

On June 24, 2014, Mr. Daye saw Dr. Yates.  Dr. Yates stated that "[o]verall [Mr. Daye is] doing pretty well."  (Doc. 7-3, p. 12).  Dr. Yates noted that Mr. Daye's psychiatrist "changed him around" and prescribed Abilify.  Dr. Yates's treatment note states that Mr. Daye was still using Ativan occasionally and that he was "doing well with the Adderall.  Still on task.  Initially, he was pretty sleepy with Abilify but now has adapted to that.  Overall feeling very well right now." (Doc. 7-3, p. 12).  Dr. Yates noted that Mr. Daye's schizophrenia was "under treatment" and that Mr. Daye's ADHD was "stable."  (Doc. 7-3, p. 12).

The Appeals Council stated that this evidence "is about a later time" and "does not affect the decision about whether [Mr. Daye was] disabled beginning on or before" the date of the ALJ's decision.  (Doc. 7-3, p. 4).

# V.   ANALYSIS

Mr. Daye argues that he is entitled to relief from the ALJ's decision because the ALJ did not properly evaluate the opinions of two consultative physicians, Dr. Dana Davis and Dr. Robert Strojohann, and because the ALJ failed to perform a longitudinal analysis.  (Doc. 9, pp. 6-15).  To evaluate these arguments, the Court has, as Mr. Daye urged, "'scrutinize[d] the record in its entirety.'"  (Doc. 9, p. 5 (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

In his opinion, the ALJ fulfilled his obligation to "state with particularity the weight given to different medical opinions and the reasons therefor." *Denomme v. Comm'r, Soc. Sec.*, 518 Fed. Appx. 875, 877 (11th Cir. 2013) (citing *Winschel*, 631 F.3d at 1179).  The ALJ gave "significant weight to the opinions and reports of Dr. Davis." (Doc. 7-3, p. 46).  Indeed, as the ALJ reported, based on her evaluation of Mr. Daye in 2013, Dr. Davis concluded that Mr. Daye, at worst, has a "mood disorder, not otherwise specified," and she "found [Mr. Daye's] report of symptoms to be questionable at best," lending support to the ALJ's statement that "the evidence repeatedly establishes the questionable nature of the claimant's mental condition given the claimant's acknowledgement that his current regimen

of treatment addressed his symptoms well without the need for inpatient treatment or hospitalization." (Doc. 7-3, pp. 35, 41; *see also* Doc. 7-8, pp. 11, 21).

Substantial evidence in the record supports the weight that the ALJ gave to the opinions and reports of Dr. Davis through the date of Dr. Davis's 2013 report, but the cumulative record suggests that Dr. Davis's reports may not merit significant weight. Dr. Davis based her opinions, at least in part, on the fact that Mr. Daye's medical records indicated that he had received treatment only from his general practice physician who had diagnosed Mr. Daye with bipolar disorder and ADHD. (Doc. 7-8, pp. 11, 21). Dr. Davis noted, and the evidence in the administrative record confirms, that Mr. Daye had not received treatment in a mental health setting as of the date of her second report. (Doc. 7-8, p. 21).

That changed, though, a few months after Dr. Davis evaluated Mr. Daye in 2013. As discussed in greater detail above, Mr. Daye was hospitalized in August 2013 after his father found him disoriented in a closet. Mr. Daye told the attending physician that he "hears voices [and] he has for many years" that instruct him to hurt himself and others. (Doc. 7-8, p. 26). Mr. Daye reported symptoms of depression and suicidal thoughts. (Doc. 7-8, p. 24). After he was discharged from the hospital, Mr. Daye sought treatment at the Calhoun-Cleburne Mental Health

Board.  After taking Mr. Daye's medical history and conducting a mental status examination, the nurse practitioner who saw Mr. Daye concluded that Mr. Daye suffered with "[p]sychosis NOS DXX Schizophrenia, Paranoid Type" and "Personality d/O NOS."  (Doc. 7-9, p. 6).  The nurse practitioner recommended "acute care in patient treatment."  (Doc. 7-9, p. 6).  Based on the nurse practitioner's findings, the therapist who saw Mr. Daye devised a treatment plan that included group therapy, family support and education, physician medical assessments, medication monitoring, crisis intervention/resolution, and mental health consultation.  (Doc. 7-9, p. 15).  The therapist also contacted Mr. Daye's father and emphasized safety precautions.  (Doc. 7-9, p. 6).

Shortly after his first outpatient mental health assessment, in September 2013, Northeast Alabama Regional Medical Center admitted Mr. Daye under the care of Dr. Christopher Randolph for inpatient treatment of mood instability and "suicidal ideation."  (Doc. 7-8, p. 38).  Based on his examination of Mr. Daye, Dr. Randolph concluded that Mr. Daye was suffering from bipolar disorder, though he found Mr. Daye's previous ADHD diagnosis questionable.  (Doc. 7-8, p. 38).  Dr. Randolph recommended that during Mr. Daye's hospitalization, he discontinue his previous medications of Adderall, Lexapro, and Wellbutrin and begin a "[t]rial

with Lamictal." (Doc. 7-8, pp. 38, 43). During his hospitalization, Mr. Daye was given a "mood stabilizer in lieu of [an] antidepressant as it appear[ed] that antidepressants have not been effective in treating his mood disorder and have, in fact, made him worse as did the stimulants," lending support to Dr. Davis's questioning of Mr. Daye's treatment by his general physician. (Doc. 7-8, p. 43).

After four days in the hospital, Mr. Daye was "discharged to follow up with the mental health center." (Doc. 7-8, pp. 43-44). Mental health treatment notes between November 2013 and December 2013 reflect ongoing efforts to adjust Mr. Daye's medication (Doc. 7-9, p. 8; Doc. 7-10, pp. 47-48), and mental health treatment notes from late 2013 through 2014 consistently report mental health disorders. (*See e.g.*, Doc. 7-3, p. 16; 7-8, p. 38; Doc. 7-9, p. 6; Doc. 7-10, pp. 47-48, 58, 62-64). Because Mr. Daye received mental health treatment in a mental health facility for the first time in 2013, the Court cannot determine whether the diagnoses that Mr. Daye received in 2013 and 2014 identify long-term mental health disorders that had gone undetected or reflect, instead, an exacerbation of pre-existing disorders. Ultimately, as discussed below, the difference is inconsequential.

Although the cumulative record indicates that the ALJ may have given too much weight to Dr. Davis's two reports, the record supports the ALJ's assessment of the report from Mr. Daye's one-time examiner, Dr. Robert Storjohann.  An ALJ owes no deference to the opinion of a one-time examining physician, *Eyre v. Comm'r, Soc. Sec.*, 586 Fed. Appx. 521 (11th Cir. 2014) (citing *McSwain v. Bowen,* 814 F.2d 617, 619 (11th Cir.1987)), and an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir. 2006).  The ALJ gave "careful consideration" to Dr. Storjohann's opinion but found it less persuasive "in light of [Mr. Daye's] medical treatment history."  (Doc. 7-3, p. 46). Substantial evidence supports the ALJ's treatment of Dr. Storjohann's opinion.

Dr. Storjohann examined Mr. Daye in December 2013.  (Doc. 7-9, p. 18). According to Dr. Storjohann's report, Mr. Daye described demonic voices and explained that he had heard the voices since he was 9 or 10 years old; the voices were telling him to hurt or kill people; he had seen demons since he was 15 or 16 years old; he had assaultive ideations; and he believed in UFOs and paranormal activity.  (Doc. 7-9, pp. 19, 20).   Dr. Storjohann noted that Mr. Daye's recent memory was "intact" and his remote memory was "grossly intact."  (Doc. 7-9, p.

21).   Though Mr. Daye's thoughts were "logical, coherent, and goal-oriented," his thought content was "quite delusional" during the exam and his judgment and insight was "extremely poor."  (Doc. 7-9, p. 22).  Dr. Storjohann concluded that Mr. Daye's prognosis "during the coming 6 to 12 months is considered extremely poor," and that he "is in need of intensive mental health treatment, perhaps to include day treatment or partial hospitalization services."  (Doc. 7-9, p. 24).

The record reflects that in August 2013, only a few months before Mr. Daye saw Dr. Storjohann for the purpose of obtaining support for his benefits claim, Mr. Daye reported to the nurse practitioner at the Calhoun-Cleburne Mental Health Board that his psychiatric problems began when he was 18 years old, not when he was 9 or 10.  (Doc. 7-9, p. 3).  This treatment record contradicts the mental health history that Mr. Daye provided to Dr. Storjohann.  None of the treatment notes from Mr. Daye's general physician between 2011 and 2012 suggests that Mr. Daye told Dr. Yates that he had experienced auditory hallucinations since he was 9 or 10 years old.  Based on the disparity between Mr. Daye's responses to Dr. Storjohann and the entirety of the medical record, it was reasonable for the ALJ to give less

weight to Dr. Storjohann's prognosis for Mr. Daye.[4]  Thus, substantial evidence in the administrative record supports the ALJ's decision to limit the impact of Dr. Storjohann's RFC opinions on the RFC that the ALJ provided in his opinion.  (*See* Doc. 7-3, pp. 37, 46).

The administrative record also reflects that the ALJ conducted a longitudinal analysis of Mr. Daye's mental health treatment between 2011 and March 2014. (Doc. 7-3, p. 37 (indicating that the ALJ carefully considered "the entire record"); Doc. 7-3, pp. 39-43 (the ALJ's lengthy assessment of Mr. Daye's mental health records)).  The undersigned may have given less weight to Dr. Davis's reports, but that is not a basis for relief.  As stated, if the record contains substantial evidence that supports the Commissioner's decision, then the Court must affirm, even if the evidence in the record preponderates against the decision.

In a nutshell, the ALJ determined that Mr. Daye suffers from severe mental health impairments, but those impairments are not disabling if Mr. Daye complies with his prescribed medications.  (Doc. 7-3, p. 35).  Substantial evidence supports

---

[4] Mr. Daye's treatment records also cast doubt on the results of psychological tests that Dr. Storjohann performed.  Dr. Storjohann concluded that Mr. Daye was functionally illiterate, possessing only a second grade ability to comprehend sentences.  (Doc. 7-9, p. 23).  Treatment records indicate that Mr. Daye's intelligence scores were somewhat higher than the scores that Dr. Storjohann assessed (Doc. 7-8, p. 11; Doc. 7-10, pp. 22-23), and Mr. Daye has stated that he has passed every portion of the GED test except for math, and he attended public school through the seventh grade.  (Doc. 7-9, p. 18; Doc. 7-8, p. 9).

this conclusion.  Mr. Daye's treatment records indicate that he frequently failed to follow his doctors' instructions regarding his prescription medications.  When Mr. Daye took his medications less frequently than he should or stopped using a prescription altogether, his mental health would deteriorate.  When he took his medications as prescribed, he was able to function adequately.  (*See e.g.*, Doc. 7-8, pp. 14-15; Doc. 7-10, p. 50).  Discharge notes from four days of inpatient treatment in late 2013, during which Mr. Daye took his prescribed medications as directed, state:  "Mood and affect are calm, well[-]modulated.  Patient is oriented.  Memory is fair.  Content is without harmful ideation or psychosis.  Processes relevant.  (Doc. 7-8, p. 43).  A treatment note from March 11, 2014 from the Calhoun-Cleburne Mental Health Board states that one of Mr. Daye's goals was to "learn to manage his mental health by reporting 50% reduction of paranoia, taking medication as prescribed and using coping tools daily."  (Doc. 7-10, p. 62).  The record reflects plans for a psychiatrist to educate Mr. Daye "on the importance of med[ication] compliance."  (Doc. 7-10, p. 63).  And, on May 28, 2014, a mental health therapist "explained to [Mr. Daye] that he must work along with the med[ications] because his body must get use[d] to them."  (Doc. 7-3, p. 24).

## V.     CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's decision is supported by substantial evidence, and the ALJ applied proper legal standards. The Court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  Accordingly, the Court affirms the Commissioner's decision.  The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 30, 2016.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE